Filed 5/3/17 Unmodified opinion attached

# CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| GARY BATZE et al., | B258732 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. Nos. BC348090 & BC399811) |
| v. | |
| SAFEWAY, INC., et al., | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING [NO CHANGE IN JUDGMENT] |
| Defendants and Respondents. | |

THE COURT*

It is ordered that the opinion filed April 4, 2017 be modified on page 74, lines 13 to 17 as follows, delete: "Section 541.706 of title 29 of the Code of Federal Regulations (formerly 29 C.F.R. § 541.109) (2004) provides

that '[a]n exempt employee will not lose the exemption by performing work of a normally nonexempt nature because of the existence of an emergency.'" and substitute the following in its place:

"As discussed, the pertinent Wage Order (No. 7-2001) provides that activities constituting exempt work and non-exempt work are to be construed in the same manner as such activities are construed in certain regulations under the Fair Labor Standards Act, effective as of 2001, including former section 541.109 of title 29 of the Code of Federal Regulations, the regulation formerly governing work during '[e]mergencies.' In 2001, section 541.109 provided that '[u]nder certain occasional emergency conditions, work which is normally performed by nonexempt employees and is nonexempt in nature will be directly and closely related to the performance of the exempt function of management and supervision and will therefore be exempt work' and that 'a bona fide executive who performs work of a normally nonexempt nature on rare occasions because of the existence of a real emergency will not, because of the performance of such emergency work, lose the exemption.' The current federal regulation governing emergency work, section 541.706 of title 29 of the Code of Federal Regulations (enacted in 2004), similarly provides: 'An exempt employee will not lose the exemption because of the existence of an emergency.'"

2

The petition for rehearing is denied. The modification does not change the judgement.

_____

EPSTEIN, P. J.,      WILLHITE, J.      MANELLA, J.,

Filed 4/4/17 Unmodified opinion

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| GARY BATZE et al., | B258732 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. Nos. BC348090 & BC399811) |
| v. | |
| SAFEWAY, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Anthony J. Mohr, Judge. Affirmed.

Daniels, Fine, Israel, Schonbuch & Lebovits, Paul R. Fine, Scott A. Brooks and Craig S. Momita; Law Offices of Ian Herzog and Ian Herzog; Law Offices of Stephen Glick and Stephen Glick for Plaintiffs and Appellants.

Littler Mendelson, J. Kevin Lilly, R. Brian Dixon and Philip L. Ross for Defendants and Respondents.

Appellants Gary Batze, Carlo Cesar and Justin Hayes brought suit against their employer, Safeway, Inc. and The Vons Companies, Inc. for failure to pay overtime wages.[1] Appellants claimed that in their positions as First and Second Assistant Managers (AMs) for respondent's stores they had been required to work long hours performing such non-managerial tasks as stocking shelves, checking customers' purchases and building product displays. After weeks of trial and the testimony of dozens of witnesses, the trial court ruled, for the most part, in respondent's favor, finding that appellants were engaged for more than 50 percent of their work week in managerial tasks, and that they met all the other qualifications to be exempt from the overtime rules. The court also ruled that during the five-month period when Batze and Hayes replaced striking hourly workers, they continued to be exempt employees. Finally, the court ruled that only those claims arising within the four years preceding appellants' respective complaints were cognizable, and declined to apply equitable tolling to relate their claims back to the filing of a proposed class action for which certification had been denied.

Appellants contend the court's findings that they spent the majority of their time at work engaged in managerial

[1] As Safeway and Vons are affiliated, the parties drew no distinctions between employees who worked at Safeway stores and those who worked at Vons stores, and the defendants were jointly referred to below as "Safeway," the two companies will jointly be referred to as "respondent."

activities during the four-year period at issue was not supported by substantial evidence. Specifically, they contend that an employee's ratio of exempt to non-exempt activities must be determined on a week-by-week basis, that no inferences may be drawn from the employee's activities in surrounding weeks, and that because the employer bears the burden of proof, for any specific week in which no defense witness observed appellants' actions at work the court should have found in appellants' favor. We reject that contention and conclude the court drew reasonable inferences from the witnesses' testimony and other evidence that established how appellants spent the majority of their time.

Appellants also contend the court improperly found that the strike period constituted an emergency that permitted respondent to assign managerial employees to non-exempt tasks without losing their exempt status. We affirm the court's decision.

Finally, appellants contend the trial court erred in ruling that the statute of limitations precluded them from raising claims based on periods of employment more than four years prior to the filing of each of their complaints. We conclude the trial court reasonably found that the filing of the class action did not toll the statute of limitations.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Background Facts*

In July 2002, a putative class action was filed by Peter Knoch and Jason Ritchey (the *Knoch* action) on behalf of all store managers and AMs employed by respondent. The claims included failure to pay overtime wages and violation of the unfair competition law (Bus. & Prof. Code, § 17200 et seq., UCL).[2] The motion for class certification was filed in November 2006. Class certification was denied in July 2007; the order denying certification was entered in September 2008.

Appellant Gary Batze, who had been a Second AM for respondent, filed his complaint for unpaid wages in February 2006. Appellants Carlo Cesar and Justin Hayes, who had been First AMs, filed their complaints in October 2008.[3] Multiple other managerial employees filed related claims against respondent in 2005 and 2006. Appellants' claims were selected to be tried together.

---

[2] Because the statute of limitations for a UCL claim is four years, the wage claims proceeded under that act; all other claims were abandoned. (See *Pineda v. Bank of America, N.A.* (2010) 50 Cal.4th 1389, 1401 [plaintiff may seek restitution of unpaid overtime wages via the UCL].)

[3] Both the First AM and Second AM were salaried positions for which respondent did not pay overtime for working more than eight hours a day or more than 40 hours a week.

B.  *Evidence at Trial*[4]

      1.  *Evidence Pertinent to Batze*

          a.  *Plaintiffs' Evidence*

Batze worked for respondents from June 1987 through August 2006.  In August 1998, he was promoted to a salaried managerial position at the Blackstone store.[5]  Between 2000 and 2006, he worked at the Clovis store, with a stint at Bakersfield and Lake Isabella stores during the five-month strike by union employees in 2003 and 2004.  Throughout his tenure as a salaried employee, he was assigned to the night/early morning shift (4:00 a.m. to noon or 1:00 p.m.), and testified that he regularly worked 50 to 60 hours per week.

According to Batze, his primary duty was building and filling merchandise displays.  He was given specifications as to the design of the displays, where they were to be placed in the store, and the merchandise to include, exercising little or no discretion.  When products requiring display arrived, he might spend up to 12 hours in a single day moving pallets of products from the back room to the floor, physically tearing

---

[4]    Due to the fact-specific nature of each appellant's work and its relationship to the caterorization of such work as exempt or non-exempt, we examine the evidence in some detail.

[5]    Batze testified that he was first given the title grocery manager and then Second AM, but that both positions involved essentially the same work.  The court ruled that any claims arising from the period Batze worked at the Blackstone store were time-barred.

down the old displays and putting up the new ones.  He also stocked shelves and was responsible for keeping the back room organized, which required him to personally move and stack pallets and merchandise some of the time.  Although Batze was the sole managerial employee at the store during the late night hours and was titularly in charge, the night crew boss normally oversaw the hourly employees.  Because few of his working hours took place when the store was open, he had little opportunity to supervise the clerks as they served customers.  Batze estimated he spent 90 to 95 percent of his time as a Second AM "doing physical manual work."

Throughout the time Batze and the other appellants were employed by respondent, the stores were required to adhere to an "operating ratio" of sales to employee salary.[6] In Batze's experience, meeting the operating ratio required salaried employees to perform the jobs of hourly workers because salaried employees could work overtime without causing the store to incur additional labor costs.

During the Southern California grocery clerks' strike that took place from October 2003 to the beginning of March 2004, Batze claimed to have worked at stores in Bakersfield and Lake Isabella for 14 to 16 hours a day for two or three weeks without a day off.  He did everything the striking

_____

[6]     The operating ratio was the number of labor hours budgeted to a store based on the store's sales.  If a store repeatedly failed to meet the operating ratio, the manager would be disciplined.

hourly employees would have done, except checking. He denied having responsibility for training the employees brought in to replace the striking workers.[7]

As a Second AM, Batze had no discretion over pricing, hours of operation, employee salary, the dress code, or the design and layout of stores. Batze was never enrolled in respondent's Retail Leadership Development (RLD) program.[8] Batze did not deny that he performed some managerial tasks, including writing employee appraisals and preparing the work schedule for the night crew, but estimated he spent only a couple of hours a year writing appraisals and only 10 to 15 minutes a week writing the schedule. He acknowledged that he had discretion over the displays in "one [or] two" locations in the store, that he could add products he believed tied in to displays, and that at least some of the displays were built by vendors, under his supervision. Batze also was responsible for minimizing "out-of-stocks" (products carried by the store that sold out, leaving empty shelves) and for placing orders for the grocery department, which comprised the bulk of the store. Managing out-of-stocks required him to walk the aisles to

---

[7] On cross-examination, Batze was shown his handwritten calendar, indicating that from January to March 2004, he was working his regular hours. Cash register data showed him working at his regular store (Clovis). Batze claimed the calendar did not necessarily reflect the hours he worked.

[8] The RLD program was respondent's program to train managerial employees and is discussed further, *infra*.

see whether the store was low on any product, scan bar codes to trigger the warehouse to send more product, confirm that deliveries had come in, and work with the night crew to get products from the pallets on which they were delivered to the shelves. He used his discretion in taking tags off the shelves when he knew or believed the warehouse was out of the described products.

Batze called fellow employees, current and former, to support his claim. Thomas Moore, a store manager who worked with Batze from 1998 to 2000, testified Batze primarily built displays and stocked shelves, and that these were typical tasks for Second AMs during Moore's tenure with respondent (1967 to 2007). Debbie Lucio, a former Second AM who worked for respondent from 1990 to 2006, observed Batze building displays and working long hours when he was a Second AM. James Saubert worked with Batze at the Clovis store. From his observations, Batze appeared to be spending the majority of his time -- 90 percent, according to Saubert -- building displays and stocking shelves. Saubert also observed Batze engaged in managerial tasks, such as talking to the receiver about organizing the back room and talking to the dairy manager about the status of orders. Tammy Baldridge worked with Batze from 1999 to 2006. She primarily observed him building displays. She took over the Second AM position when Batze left. She spent a significant part of her shifts "throw[ing] loads" (organizing products delivered to the back room) and building displays. Tom Dunehew worked as a

8

Second AM for 12 years, and held that position at the Clovis store after Batze and Baldridge left. Dunehew testified that as a Second AM, he primarily built and filled displays and stocked shelves. Staci Dack worked with Batze at Clovis for six years. She recalled that Batze was at work before she arrived for her eight-hour shift and remained there after she left. She primarily observed him building displays or helping the night crew stock shelves.

2. *Defense Evidence*

Michelle Macaluso was the store manager who supervised Batze at the Clovis store from January 2004 to August 2006, when Batze left respondent's employ. The Clovis store was very large and busy. There were 115 to 125 employees, and weekly sales were approximately $600,000. It was open from 6:00 a.m. to midnight. Macaluso worked from 6:00 or 7:00 a.m. to 5:30 p.m., Monday through Wednesday, and Friday and Saturday, 48 to 50 hours per week. Batze, who started at 4:00 a.m., generally left on time at noon or 1:00 p.m., or if he worked late one day, left early another.

Macaluso testified Batze was responsible for "merchandising," making sure displays were built at the correct place in the store and filled. Batze had some discretion concerning where to place displays and how large they would be. He could create a theme for a display, such as a holiday theme, and could add items he believed were tied in to the products he was required to include. There

9

were 40 to 45 displays in the store; some changed weekly or monthly, but others were permanent. Batze built four to six displays per week. He had the assistance of the "GM" manager, an hourly position, when he built them. Vendors were responsible for many of the displays, and Batze coordinated with 20 to 25 vendors per week concerning their displays and where to place them. Because the Clovis store was so large, Batze had discretion to give vendors additional display space. Macaluso disputed that Batze could have spent 90 percent of his time building displays because they were built only Mondays through Wednesdays.

Batze supervised the ten employees, (including four clerks, two night crew supervisors, a receiver, and a scan coordinator) on duty at night. He coached them and reviewed their performance. He addressed their negative behavior. He trained new employees. Batze also was responsible for the back room, making sure it was organized and that vendors delivered the correct amount of product. He had the assistance of the store's receiver, an hourly employee. Batze placed his office in the back area so he could more easily interact with the vendors. Macaluso confirmed that Batze was responsible for minimizing the store's out-of-stocks. In that role, he coordinated with department managers or the receiver to ensure they ordered correctly to prevent the problem from arising. Personally walking up and down the aisles assisted him in managing out-of-stocks, as it permitted him to determine where and when the problems arose. Macaluso put Batze in charge of

eliminating or minimizing "shrink" (unsold products, such as those that spoil and must be discarded).  She credited him with producing "the best shrink numbers in the district."  Batze also was on the safety committee which met monthly and regularly communicated safety concerns to employees.  Macaluso estimated Batze spent 60 percent of his time on managerial work.

Respondent introduced a number of notes Macaluso wrote to Batze about his management skills, including one congratulating him for achieving a score of "100%" on the "[s]hrink audit."  Respondent also introduced performance appraisals demonstrating Batze had been commended for "mak[ing] good decisions," "involv[ing] his employees in some decision making," "foster[ing] a positive attitude with employees," "tak[ing] charge of his department," "build[ing] a strong team," "display[ing] good leadership qualities," "improv[ing] sales in the grocery department," and "manag[ing] with minimal supervision."  Concerning his claim to have worked overtime in Bakersfield and Lake Isabella during the strike, respondent submitted cash register data showing Batze working in the Clovis store in the early part of 2004.  Macaluso testified that Batze was working with her in Clovis from January 2004 until the strike ended.

Batze was the subject of an observational study on September 27, 2004 (a Monday), over a year before he filed suit.  The observer tracked him through the store that day and wrote down precisely how much time he spent on his

various activities.[9] He was observed performing a substantial number of managerial tasks, including walking the aisles of the store (performing a "store walk") while talking to the receiver about ordering, talking to clerks, stockers and the receiver about the schedule, directing a clerk to make tags and signs, asking a clerk about the status of an order, telling a stocker how to arrange merchandise, directing a stocker to arrange a display, talking to a stocker about a soda shipment, talking on the phone with a frozen food manager about placing an order, talking to the dairy manager about diversity training, talking with a store manager about a sick employee, and talking to a vendor about an order, stock levels and display changes. The observational study showed that Batze spent approximately 40 percent of his time "[b]uilding [d]isplays and [s]tocking" and minimal amounts of time on other non-exempt work.[10] Overall, the study showed that Batze spent 53.6 percent of

---

[9] Batze told the observer that he would not have done anything differently had he not been observed, and that there was nothing unusual about how he spent his time that day. He testified the tasks he performed that day were "typical" but not the hours worked.

[10] Besides building displays and stocking, Batze was observed performing such non-exempt tasks as moving and stacking pallets, physically reorganizing the back room, ringing purchases, setting up mats at the front of the store, taking out trash, breaking down boxes, and helping customers. Although there were many such tasks over the course of the observed day, none took more than a few minutes each.

his time on managerial work and 46.4 percent on non-exempt tasks.

### 2. *Evidence Pertinent to Cesar*
#### a. *Plaintiffs' Evidence*

Cesar began working for respondent in June 1987 and was still employed by respondent at the time of trial. In August 2002, while working at the Dublin store, he became a First AM.[11] Prior to assuming the position, he completed respondent's Retail Leadership Development program.[12]

---

[11] Prior to becoming a First AM, Cesar had been a Second AM, but due to the trial court's ruling on the statute of limitations, none of his time as a Second AM was considered by the court in making its decision. During the relevant period (2004 to 2008), Cesar worked at eight different stores: Dublin in 2004, Livermore from 2004 to 2006, Pleasanton in 2006, Pleasant Hill in 2006, Lafayette from 2006 to 2007, Orinda from 2007 to 2008, Blackhawk/Danville in 2009, and Alamo.

[12] Respondent introduced evidence that the RLD program consisted of six months of classes, and that it cost respondent over $50,000 per trainee. The program materials described typical responsibilities of a First AM as "writing next week's front end schedules, monitoring the ad special in-stock position for evening business, and checking and assisting with customer questions and issues." The First AM was "officially 'in charge' the minute the Store Manager leaves the store." The First AM was also responsible for "managing overall operations, . . . making sure that end displays are up and stocked, the floors maintained, fluid dairy products are property filled, the bread displays are fully stocked and rotated, spot-stocking fast selling items, reporting out-of-stocks, ensuring that orders are

(*Fn. continued on next page.*)

The program trained him to work in every part of the store. This was because managers were expected to understand how to do everything in the store and be able to fill in everywhere. Cesar described his duties as being a "gap-filler. . . , filling gaps wherever it's needed," including checking, stocking shelves and organizing the back room. He said that using AMs to perform the work of hourly employees allowed stores to meet their prescribed operating ratio.

Cesar testified that he spent between 60 and 90 percent of his work time on non-exempt tasks, and that the allocation between managerial and non-managerial tasks was fairly similar at all the stores in which he worked as an AM. At his then current position, the Alamo store, almost every day he would be given a list of non-exempt tasks by the store manager, such as cleaning a freezer, filling an outside stand with advertising brochures, moving products on and off the floor, straightening products in displays or on the shelves, or cleaning and organizing the upstairs storage

transmitted on time, safe work habits are being observed, and monitoring front end operations." A "key responsibility" for the First AM was "to maintain superior Service in the store, especially monitoring the front end for service levels." In addition, the First AM "respond[ed] to customer inquiries" and "handle[d] employee issues that ar[o]se during [his or] her shift." The First AM was to "take[] full responsibility for operating the store during [his or] her shift."

14

area.  He stated that he checked and stocked shelves almost every day, and was often formally scheduled to be a stocker or the backup checker.  He recently had been asked to wear the badge of a "manager in training" because the union had complained about the Alamo store having too many salaried employees.

According to Cesar, one of his duties at virtually all the stores to which he had been assigned was to work as the "front-end" manager.  This required him to stay at the front of the store observing the checkers, directing customers, calling for more checkers, and checking "as needed."[13]  At Alamo, Cesar was assigned the task of managing the front-end approximately one to two hours per day.  At the Blackhawk/Danville store, his prior assignment, he spent three to four hours at the front-end.  At Orinda and Lafayette, he was in the front-end three to six hours daily.  At the Pleasanton store, almost all his time was in the front-end.  At Pleasant Hill, he was at the front-end one to two hours per day.  At the Livermore store, he was at the front-

---

[13]    When working as the front-end manager, Cesar estimated he had to jump in and assist with checking from one to four hours on any given day.  However, respondent produced computerized logs of employee checking activity that showed Cesar generally checked no more than one to three hours per week.  In addition, defense witnesses testified that during an audit, the AM at the front-end was instructed to manage, not check.  As will be discussed in greater detail, the logs showed Cesar checking a significant amount of time over the course of certain weeks.  The trial court awarded him overtime for those weeks.

end from two to six hours until the store got a new manager, at which point he was reassigned and spent more time stocking and organizing the back room. At Dublin, he averaged two to four hours per day in the front-end.

Cesar did not deny that he spent some time in the manager's office every day performing managerial tasks, such as writing schedules, attending meetings, reading and responding to emails, disciplining employees and taking calls. He estimated that at the Alamo store, he was in the office one to two hours per day. Overall, he estimated that he averaged between one and two hours per day in the office throughout his tenure as an AM, except on those days he had a specific task requiring more office time. At Blackhawk/Danville, the time he spent in the office was slightly less. Cesar acknowledged that in his position as AM, he disciplined and terminated employees and sometimes delegated longer tasks to others. He acknowledged that when performing a non-managerial task, he would frequently have to shift duties to take care of a managerial function.

One of Cesar's regular duties was to perform a store walk at the end of his shift, checking displays and ordering items needed to fill them, and making sure products on shelves around the perimeter were "faced" (placed neatly on the shelf, older items in the front). He performed dozens of shorter store walks every day to observe store conditions. During those store walks, he sometimes brought a dolly full of merchandise to fill in shelves or displays. He also looked

for opportunities to observe and communicate with employees, and to ensure they were staying on task.

In his deposition, Cesar was asked about what he had done on his most recent day of work, a day he had described as "typical." He testified he met with the store manager when he arrived at work and obtained a list of tasks, which was not lengthy. He had a meeting that lasted 30 minutes and participated in a conference call. He checked his email. He conducted a short store walk, during which he greeted department managers, fixed the problems he could, and put other items on a list to be handled later, either by himself or assigned to other employees, at his discretion. He testified that he checked for an hour and stocked shelves and worked on displays for only one to two hours that day.

In 2009, after his stint at the Orinda store and a period of disability, Cesar was placed on a Performance Improvement Plan (PIP) by his superiors. Under the PIP, he was given the goal of keeping out-of-stocks to fewer than 120 daily. He was told to "identify and develop at least one department manager and two employees to meet [respondent's] goal in key performance areas, service, [out-of-stocks], shrink, foot safety and sanitation." He was told to make sure to sign off on various inspections. Other goals given in the PIP were to plan advertising weekly with department managers and order writers; attend weekly profit hour meetings; perform "mock shops" and "role plays" with employees to test their performance; hold three "huddles" daily with employees; create a list while walking

17

the store for merchandising, food safety and sanitation; delegate tasks to employees with follow-up; and develop a system to ensure all department managers knew about sales and projections.

In his annual evaluations, Cesar had been praised for his hiring, training, coaching and mentoring efforts. He had been criticized for failing to "get involved in opportunities to save costs and add value to [the] bottom line," "demonstrate an acceptable degree of forecasting and scheduling ability," "spend [sufficient] time on scheduling and in merchandising for sales," "follow through on the work that he has delegated," and review the inventory report. He also was criticized when a store to which he was assigned failed to pass its safety audit on multiple occasions, and was directed to monitor safety issues more closely and to perform more "safety laps." He had been told in his evaluations to "address disciplinary issues," "take a more active role in identifying and solving store issues," "improve on holding people accountable and following up on directions given," "tak[e] charge of an issue or opportunity to improve the overall store performance," "[rally] employees to service excellence," and "identify opportunities in the operation and then make the improvements." One evaluation said that Cesar "works hard, but does not work the big picture," that he was "very adaptable to various demands and assignments[,] always willing to get in and work," but that his "willingness to roll up [his] sleeves [got] in the way of managerial functions."

A number of Cesar's fellow employees testified in support of his claim that he spent more than half his work time on non-exempt tasks. Jonathan Meyer worked with Cesar at the Dublin, Livermore and Blackhawk/Danville stores.[14] According to Meyer, Cesar spent much of his time at Dublin checking, "throwing freight," and stocking shelves. If an hourly employee called in sick, Cesar would take over his or her job. At the Livermore store, Cesar worked alongside Meyer, building displays and stocking shelves. Meyer estimated 90 to 95 percent of Cesar's time was spent performing non-managerial work.

Thomas Hogan, a store manager, supervised Cesar at the Livermore store in 2005 and 2006.[15] Hogan acknowledged AMs were responsible for watching out for problems and training staff, but stated there were not enough hourly employees at the store to perform all the necessary tasks, requiring use of salaried managers to fill in to meet the prescribed operating ratio. Hogan believed the majority of Cesar's day was spent checking, cleaning or stocking shelves, rather than performing managerial tasks. Hogan acknowledged that Cesar was in charge of the store two days a week, on Hogan's days off.

---

[14] At the time of his testimony, Meyer was pursuing a claim against respondent.

[15] At the time of his testimony, Hogan was pursuing a claim against respondent.

Nicholas Schirato worked with Cesar at the Livermore store, where Schirato was a Second AM.[16] Schirato observed Cesar stocking shelves, "merchandising" and cleaning. He estimated Cesar spent 90 percent of his time performing those tasks.

Jennifer Attia, an hourly employee, worked with Cesar in Pleasant Hill, where Cesar had been acting store manager, and at the Alamo store.[17] Cesar stocked shelves, checked and generally did whatever needed to be done, including relieving employees on breaks. Attia did not see Cesar in the office very much at Alamo. Attia acknowledged that Cesar used store walks to observe how employees were doing their jobs and to see what needed to be done.

Vickie Penny, a clerk, Amy Carey, a clerk and former AM, and Debra Penny, a bookkeeper and clerk, worked with Cesar at the Lafayette store.[18] They testified he was stocking or checking 85 to 90 percent of the time. Carey also recalled Cesar building displays. Debra Penny said he frequently watched the front-end.[19]

---

[16]     At the time of his testimony, Schirato was pursuing a claim against respondent.

[17]     At the time of her testimony, Attia's husband was pursuing a claim against respondent.

[18]     Debra Penny testified that she intended to pursue a claim against respondent.

[19]     At the time of her testimony Debra Penny was working with Cesar at Alamo. She observed him stocking shelves and
(*Fn. continued on next page.*)

Jeremy Schoen and Shena Meyer worked with Cesar at the Orinda store.[20]  Schoen testified that for the majority of his time at work, Cesar checked, worked freight or filled displays.  In Meyer's perception, Cesar was greeting customers, stocking shelves, facing, checking, bagging and helping in any short-staffed department 95 percent of the time.

Tracy Pierson, an hourly employee, Carole Drevno, a front-end manager, and Gary Dunmoyer, a day stocker, worked with Cesar at the Blackhawk/Danville store.[21]  They testified that the bulk of his day was spent on the sales floor, doing non-managerial tasks, such as stocking, checking and building displays.  He was in the office one to two hours per day.

Susan Bryce and Scott Benvie, both hourly clerks, and Daniel Carey worked with Cesar at the Alamo store.[22]  They testified they typically observed him stocking shelves and building displays.  Bryce testified that Cesar checked more than the other managers.  Carey also observed Cesar

---

filling seasonal displays, and estimated he spent 85 percent of his time on physical tasks.

[20]    At the time of her testimony, Meyer's husband was pursuing a claim against respondent.

[21]    Dunmoyer later became a Second AM, and at the time of his testimony, was a plaintiff in a lawsuit against respondent.

[22]    Carey later became an AM, and was planning on pursuing a claim against respondent.

working in the back room, checking and helping supervise in the front.

b. *Defense Evidence*

Janet Navarrette worked in the Dublin store with Cesar in 2004. She was the deli manager. She saw Cesar performing store walks of up to two hours. She rarely saw him working at the cash registers. In Navarette's estimation, Cesar spent 50 percent of his time in the office, dealing with managers, vendors and employees.

Beverly Gandolfo, a Second AM, worked with Cesar at the Livermore store in 2006 and at the Alamo store, his then current assignment. Gandolfo had been a stocker at the Livermore store and did not observe Cesar working in that capacity with any frequency. There were sufficient hourly stockers at the store to complete the task without the assistance of the AMs. Gandolfo described her responsibilities as an AM at Alamo as observing, coaching and mentoring employees, preparing the work schedule, preparing time and attendance reports, reviewing emails, participating in conference calls, and performing store walks. She spent a great deal of her time in the office. During store walks, she observed employees and talked to them about service, met with the various department managers, checked for out-of-stocks, and made sure missing items were ordered. She did not have time during store walks to perform tasks that could be delegated to an hourly employee. Because she was responsible for controlling out-

of-stocks, she sometimes scanned them herself. This facilitated her ability to follow up with her crew and the receiver to determine why the problem had arisen. Gandolfo had seen Cesar perform store walks at Alamo and did not notice him doing anything differently than she did. She often saw Cesar working in the office. She acknowledged that she sometimes worked on displays, stocked shelves and checked, and was occasionally given a non-managerial task to perform by the store manager, but maintained that she performed managerial work the majority of her time. She had not seen Cesar stocking shelves, building displays or checking for lengthy periods. On a typical day, those activities would occupy less than two hours of a manager's time.

Helen Carver was the district manager when Cesar was the acting manager at Pleasant Hill and when he worked at the Lafayette and Orinda stores. Carver transferred Cesar from Pleasant Hill to the Lafayette store, after observing that the Pleasant Hill store was experiencing problems with cleanliness, organization and missing signage. When Carver spoke to Cesar about the problems the store was experiencing and his transfer, he did not suggest that spending time on non-exempt work had interfered with his ability to properly manage the store. After Cesar's transfer to Lafayette, Carver observed problems with cleanliness, out-of-stocks and poor service, and saw that quick-moving products were not being stored in the right place for easy access. Carver helped prepare the

23

PIP, which was put in place after Cesar returned from leave to begin work at Blackhawk/Danville. Carver further testified that she expected managerial employees to deal directly with out-of-stocks because minimizing them required coordinating with order writers and determining what items were likely to be hot sellers and why. Carver explained that during a "checkout success" audit, imposed on a store when it was not meeting service goals, managers were told to stand in front of the store and oversee the checkers, not to check themselves.

Steven Kozak was the store manager for the Blackhawk/Danville store where Cesar was assigned after being placed on the PIP. The store was large, with 100 to 150 employees. There were sufficient numbers of nonsalaried people to perform all needed stocking and checking. Kozak had no trouble meeting the operating ratio without overusing salaried managers. He did not expect Cesar to spend more than half his time on non-managerial functions. When Kozak performed a store walk, he took notes, wrote down "opportunities," made a list of tasks, talked to staff, made sure the departments were up and running, coached and gave direction. He trained Cesar to do the same. He gave Cesar other managerial responsibilities, including preparing the weekly marketing plan. He told Cesar to pick a different department every day and meet with the employees working in that department to coach them on service. He instructed Cesar to document that he had engaged in three "huddles" daily. He saw Cesar

24

stepping in to check more often than he should have, and told him "he should not be the first person in the check stand." Kozak did not observe Cesar stocking shelves for long periods.

Kimberly Johnson took over from Kozak as store manager for Blackhawk/Danville. She supervised Cesar in 2009. She twice admonished Cesar to do less checking. Once, she had been out for part of the day and returned to find Cesar checking when the lines were not long. She told him to move on to other tasks. Johnson performed store walks with Cesar in the afternoons. During those walks, they would evaluate store conditions, make adjustments, talk to employees about service, coach and role play, delegate tasks to prepare for the evening business, and tidy up displays. Cesar would perform a store walk on his own in the morning for approximately two hours. She observed Cesar interacting with employees throughout his workday.[23] The store had multiple hourly stockers, and Cesar was assigned to oversee them and keep them on task. Out-of-stocks were scanned three times a day by managerial employees. Cesar typically did the afternoon scan. After the scan, a report was generated that Johnson and Cesar

---

[23] Johnson testified that when she was on the floor she was constantly being interrupted by employees with questions, and that she spent her time on the floor "looking at store conditions," "checking to make sure people have followed through on tasks . . . assigned them," and "watching . . . employees interact with customers."

reviewed and used to delegate tasks to the various departments. Johnson discouraged Cesar from writing orders himself, and told him to use the report as a training opportunity and to go over out-of-stock problems with the order writers. Johnson estimated Cesar spent 20 to 25 percent of his time at the front-end of the store and 60 to 70 percent on the floor, and that 80 percent of this front-end and floor time was spent on managerial tasks. Cesar worked in the back room 10 percent of his time, and half of that was managerial. He was in the office 10 to 15 percent of his time, and all of that was managerial.

Adrienne Simpson worked with Cesar at the Blackhawk/Danville store in 2009. In her capacity as a bookkeeper, she was frequently in and out of the manager's office. She saw Cesar in the office a couple of hours each day. She observed him directing employees to perform various tasks and disciplining employees. She saw him in the check stands daily, but only for a few minutes at a time. She never saw him stocking shelves.

Susan Obenour was the deli manager at the Alamo store and worked with Cesar in 2009. From her work area, she could see the manager's office. She also went in and out of the office multiple times a day. She estimated Cesar was in the manager's office from 30 to 55 percent of his time. When Cesar did his morning store walk, Obenour observed him writing notes about problems that she and other department managers might be having.

### 3. *Justin Hayes*
#### a. *Plaintiffs' Evidence*

Hayes completed respondent's RLD program in 2003. He was working as a First AM at the Citrus Heights store at the time of trial. He had worked as a First AM at the Arden Way store from 2004 to 2007, at the West Sacramento store for a few months in 2007, and at the Elk Grove/Laguna store from 2007 to 2009.[24] In addition, he had been acting store manager for part of his tenure at the West Sacramento and Elk Grove/Laguna stores.

Hayes's hours were generally 7:30 am. to 5:30 p.m. or 10:00 a.m. to 8:00 p.m. He estimated that 90 percent of his time as First AM was spent on "physical things," including checking, stocking shelves, dealing with deliveries and manning the customer service counter.[25] Even during the periods he was acting store manager, he believed he spent 80 to 90 percent of his time on non-managerial work. He did

---

[24] Hayes became a Second AM in 2001 and a First AM in 2004. Because of its statute of limitations ruling, the trial court considered only the period from October 2004 onward, after Hayes had become a First AM. Like Batze, Hayes claimed to have replaced striking hourly workers during the 2003 to 2004 strike, but the court found that Hayes's claims for that period were foreclosed by the statute of limitations.

[25] Hayes included in the calculation time spent standing at the front-end overseeing the checkers, a task he performed from 3:00 p.m. to 7:00 p.m. every day and 10:00 a.m. to 7:00 p.m. on weekends during a period when two of his stores were being audited for their "checkout success."

non-managerial tasks because there was no one else to do them.  A few months prior to trial, the district manager threatened him with termination if his store did not meet its operating ratio.  The district manager told him that if Hayes had to send hourly people home and take over checking, that was what he should do.

On cross-examination, Hayes acknowledged performing managerial tasks.  He was responsible for minimizing out-of-stocks.  He regularly reviewed emails, service reports, the store schedule, payroll documents, out-of-stock reports, budget reports and sales reports.  When he performed a store walk, he stopped to speak to department managers and looked for safety issues.  His responsibilities for the front-end included evaluating the clerks.  He performed financial forecasting.  He was acting manager at his current store when the store manager was out, during which time he was responsible for supervising all the store's employees.  At his deposition, Hayes testified he was in the office up to two hours daily.

Hayes injured his shoulder in 2003.  After examining Hayes, the medical examiners reported that he was "working more in management so has been able to work full duty" and that he had "progressed to an[] upper position not requiring the same duties as [a] retail clerk."

Kristin Caro and Susan Venrick-Mardon, both hourly employees, worked with Hayes at the Arden Way store when he was an AM.  They testified that Hayes did every job that needed to be done, including checking, stocking shelves,

28

building and filling displays and filling out-of-stocks. Caro testified Hayes was rarely in the office, and that he was performing some type of non-managerial physical labor 80 percent of the time.

Sajid Khan, a checker, worked with Hayes at the West Sacramento store and the Elk Grove/Laguna store. At West Sacramento, he saw Hayes spending significant time returning misplaced items to shelves, stocking, checking and helping with shipments from vendors. At Elk Grove/Laguna, Hayes spent most of his time setting up promotional or holiday displays. Hayes also checked and stocked. He was rarely in the office at either store.

Patricia Hadley, Dale Martin, Kashmira Law and Sherry Venezio worked with Hayes at the Elk Grove/Laguna store.[26] They all testified that Hayes spent most of his time -- 80 to 90 percent -- on non-exempt tasks, including checking, throwing freight, filling out-of-stocks, building displays and organizing the back room.

Thomas LePage, the manager of the Elk Grove/Laguna store testified on Hayes's behalf.[27] He said Hayes occupied his workdays checking, stocking shelves and building displays. Hayes was in the office five to ten percent of his time and a little longer on the days he put together the

[26]    At the time of his testimony, Martin was pursuing a claim against respondent.

[27]    At the time of his testimony, LePage was pursuing a claim against respondent.

schedule. LePage testified he was told to use AMs in positions like checking and stocking because there were not enough hours of administrative work to fill their time. LePage acknowledged that Hayes had to fulfill more managerial tasks when he took over as acting store manager when LePage was out.

b. *Defense Evidence*

Camelia Chira worked with Hayes at the Arden Way store. She was the Second AM. She saw Hayes preparing the schedule, working on projections, and doing other paperwork. Hayes trained Chira to do the paperwork required of an AM. She did not recall ever seeing him stocking shelves. He performed store walks, during which he talked to employees and customers, fixed things and made sure everything was running smoothly. She occasionally saw him check. He spent the bulk of his time, up to 70 percent, in the office.

Joseph Chappelle, a store manager, supervised Hayes at the Arden Way store. He testified that Hayes wrote the schedule for the night crew, the front-end and the courtesy clerks -- more than 70 employees. Writing the schedule required knowledge of sales projections and hours allotted by the operating ratio. It also required knowledge of which checkers were better than others, so they would be scheduled during prime periods, and input from the employees as to when they wanted time off. Hayes spent eight to ten hours per week on the schedule. Chappelle testified that Hayes

spent 75 percent of his time in the office, writing the schedule, pulling reports and e-mails, and participating in conference calls and meetings.  Hayes checked only 5 percent of his day, and was even less involved with stocking shelves or building displays.  Those tasks were taken care of by hourly employees.

 Lisa Lewis became the store manager of the West Sacramento store at the end of 2007, relieving Hayes who had been acting manager.  When she arrived, she asked him to stay on for two weeks and run the store as if she were not there.  Hayes prepared sales plans, wrote the schedule, talked to employees, and walked around the front-end to make observations.  He replenished eggs or milk a few times during that period, but that task took only five to ten minutes at a time.  Hayes spent 80 percent of his time in the office, and lesser amounts of time managing the front-end or performing a store walk.  There were more than 60 employees, and preparing the schedule could take up to two hours.  After Lewis became manager of the West Sacramento store, she spent most of her time in the office.  She spent time checking, but rarely built displays or stocked shelves.  Managing the front-end required her to observe the checkers to see if there were any inefficiencies in their manner of working that could be corrected.  When she performed a store walk, she put items back where they belonged, but also talked to the department managers, and made notes of tasks to hand off to employees.

Lewis had been First AM at the Elk Grove/Laguna store, where Hayes went after West Sacramento. Her duties there were very similar to her duties as store manager because the Elk Grove/Laguna store manager, LePage, was frequently absent and left her in control of the store. She estimated she spent 70 percent of her time managing. She never had to check or stock for the store to meet its operating ratio.

Nicholas Patmore, a produce manager, worked with Hayes at the Elk Grove/Laguna store. Hayes was usually in the office when Patmore needed to find him. When an extra checker was needed, someone from the produce department would step in, not Hayes. Patmore saw Hayes walking the store, but not stocking shelves.

John Cain was a district manager and a 35-year employee of respondent. Hayes had been an assistant manager in his district for ten years. Because Hayes's Citrus Heights store was near Cain's office, Cain visited it frequently. He normally found Hayes in the store manager's office. Hayes took over the manager's duties on the manager's two days off per week and during the manager's vacations.

Cain also discussed the typical responsibilities of the First AMs in his district. They are responsible for store safety and participate in safety calls every week. They are responsible for ensuring that the store's departments do not go over budget on supplies. They keep track of sales forecasts and checker productivity. They are responsible for

32

developing ways to minimize shrink. They are expected to deal with product recalls. They are responsible for front-end service, including the checkers' performance and the appearance of the areas in front of the store. They are expected to observe employees on the sales floor and to train, coach and "role play" with them. Cain testified that First AMs engaged in those and other managerial tasks more than 50 percent of the time.

Lance Feliciano, a receiving clerk, worked with Hayes at the Citrus Heights store. Hayes frequently called Feliciano away from his regular responsibilities to work as a checker. Feliciano rarely saw Hayes checking and never saw him stocking shelves. Feliciano estimated Hayes spent 70 to 80 percent of his time in the manager's office.

Melissa Mastalski, a deli manager, worked with Hayes at the Citrus Heights store. She never saw Hayes stocking shelves. She occasionally saw him checking, but only for a few minutes a day. Mastalski would go to Hayes for help with employee disciplinary problems, because Hayes "t[ook] care of the discipline of employees" for the store. She described him as a "by-the-book" manager who spent most of his time in the office. Mastalski further stated that the store manager preferred to work on the floor and let Hayes handle the office work and the more administrative parts of managing the store.

B. *Trial Court's Statement of Decision*
     1. *Preliminary Findings*

After hearing the evidence, the trial court prepared a 101-page modified statement of decision (MSOD) that summarized and analyzed the evidence in great detail.[28] The court recognized that its primary task was to determine "how each plaintiff spent his time," particularly whether "they customarily and regularly exercised discretion" and "devote[d] more than 50% of their time to exempt activities."[29] The secondary issue was "if they did not, was their failure . . . due to their own substandard work such that they failed to meet [respondent's] realistic expectations

---

[28]    The court prepared a tentative decision, which was entirely in favor of respondent. A few days after appellants submitted objections to the tentative decision, this court issued its opinion in *Heyen v. Safeway Inc.* (2013) 216 Cal.App.4th 795 (*Heyen*). Following further briefing and argument, the court issued the MSOD.

[29]    The court found that appellants indisputably met certain of the criteria of the exemption: "They managed a work unit with a permanent status and function. Batze handled the night crew. Cesar and Hayes supervised at least the front end of their stores and usually their entire stores. . . . Second, [appellants] directed the work of at least two other employees, and usually more than that. Third, there is evidence that each [appellant] had the authority to make suggestions and recommendations as to the employees they supervised. As the evidence [showed], all three could discipline and admonish . . . . Finally, their monthly salary met the minimum amount." (See Wage Order No. 7-2001 [Cal. Code Regs., tit. 8, § 11070, subd. (1)(A)], discussed further, *infra*.)

34

with respect to [AMs]?" The court recognized that respondent bore the burden of "convinc[ing] [the] court that it realistically expected people like [appellants] to manage, and that they in fact did so more than half the time." The court also recognized that exemptions to the general rule requiring employees to be paid overtime "are narrowly construed against the employer and the application is limited to employees who are plainly and unmistakably within their terms." On the evidence before it, the court found in favor of respondent on both issues.

Preliminarily, the court rejected the contention that because respondent bore the burden of proof, "it must produce evidence of [the] tasks [appellants] performed during every workweek for which liability is in question." Instead, the court ruled that respondent could properly rely on logical inferences or evidence from which extrapolation was possible.[30] The court acknowledged it should not apply data directly pertinent to one appellant to another, but found it "proper to consider a store's time records for one [appellant's] so-called typical day in determining [the] time

---

[30]    In making this ruling, the court cited a July 6, 1993 Division of Labor Standards Enforcement (DLSE) Opinion Letter stating: "[T]he Division take the position that if an employee fulfills all of the other requirements of the managerial or executive exemption, the presumption is that the activity the employee is 'engaged in' is probably exempt, unless the facts prove to the contrary." (Underscoring omitted.)

the same person spent on other days in the same store, or even in stores of similar size and characteristics."

The court then considered how to categorize three of the predominant work activities engaged in by appellants: store walks, managing out-of-stocks, and working at the front-end. The court recognized that "[t]he regulations do not recognize hybrid activities," and that "each discrete task [must] be separately classified as exempt or non[-]exempt." The court found that "store walks, especially long ones, constitute exempt tasks." They were, the court observed, "the chief method a manager uses to determine what is going on in the store and where (and with whom) he needs to devote attention." The walks "offer an opportunity to interact with employees, survey the merchandise and spot needs, especially with respect to the all-important out-of-stocks." The court concluded that "[a] momentary pause" to relocate or rearrange products did not transform the activity from exempt to non-exempt: "The purpose of the walk remains managerial . . . ."

With respect to managing out-of-stocks, the court broke down the activity into three parts -- "counting, ordering and replenishing." The court found that "replenishing" -- essentially stocking shelves -- was non-exempt. It found the other two aspects of managing out-of-stocks to be managerial. Taking part in scanning the tags on the shelves allowed the AM to personally determine where the problems were, what items were fast-moving and the time of day they were likely to run out. Thus, "the AM can assess the

36

situation and determine if the [out-of-stock] comes from the vendor, the failure of the night clerk to order, a problem at the warehouse, or a problem that can be controlled at the store level." Taking part in ordering allowed the AM to give order writers input and training. Moreover, fixing the problem might require the AM to communicate directly with the vendor to determine what happened. If an employee were "told to scan [out-of-stocks] and d[id] simply that," the activity would be non-exempt, but because the evidence indicated the AMs performed the scanning as part of their managerial responsibilities, the court found the activity exempt.

Finally, the court found that the time appellants spent at the front-end was exempt time. The purpose of the task was to "regulat[e] the work flow and/or [watch] and evaluat[e] the performance of their employees . . . ." Because "[t]he manager is surveying the employees and trying to ensure that they deliver excellent service, that the checkout lines run smoothly, and that no confounding incidents occur[,] [t]he activity calls for discretion and independent judgment and qualifies as exempt."

## 2. *Exercise of Discretion*

With respect to the exercise of discretion, the court noted that respondent limited an AM's discretion in significant ways: "The inventory they carry, the merchandise they display, the manner in which they display it, how much they display -- [respondent] dictates all of those

37

points. . . . Just about everything is measured and audited either by a corporate auditor, a division auditor, a field merchandiser, or [a district manager]." Nevertheless, the court concluded that "[a]ll the micromanaging [respondent] engaged in did not eliminate the need for a person with common sense and leadership ability to exercise the discretion needed to make the store operate according to [respondent's] practices and procedures, schedules and schematics." The evidence pertaining to each appellant "show[ed] they got involved with employees . . . , coaching and disciplining and training them." The AMs were expected to "schedule their stores, train the front-end employees, train the courtesy clerks, and hold a minimum of two huddles a day," in short, "create order out of chaos." While they may have been "tightly bound," the court concluded "managers do not lose their exempt status when their job is to manage the little things. If left unchecked, little problems can become big problems."

Turning to the related question whether each appellant spent more than 50 percent of his time in managerial activities requiring the exercise of discretion, the court reviewed all the testimony and made credibility findings before concluding that respondent had largely met its burden of proof on this issue.

### 3. *Batze*

With respect to Batze, the court pointed out that Batze himself had acknowledged "he wrote the schedule," "was

38

responsible for managing the grocery department, which constituted the bulk of the store," "was responsible for keeping the back room organized," "gave personal evaluations to employees," and "wrote appraisals . . . ." Batze's testimony with respect to taking labels off the shelves to create the impression the number of out-of-stocks was lower than it actually was constituted an exercise of managerial discretion and "support[ed] an inference that this activity [was] exempt." The court observed that even witnesses called to support Batze's claim attested to observing him engaged in managerial tasks, such as Saubert's testimony that Batze talked to the receiver and dairy manager about employee performance and orders.

In support of its finding that Batze spent the majority of his time on exempt work, the court found credible Macaluso's testimony that Batze spent 60 percent of his time performing managerial duties. The court found her testimony "straightforward" and "honest." In addition, her testimony was supported by memoranda she wrote and compliments she directed to Batze for his management work. The court found particularly significant Macaluso's testimony that Batze coordinated and negotiated with 20 to 25 vendors per week to determine where they would put their displays: "Ms. Macaluso testified, and this court agrees, that the relationship between an AM like Gary Batze and a vendor was important. If they did not get along, the store would suffer lost sales and lost loyalty." The court also found significant the evidence that Batze was put in charge

of eliminating shrink, and that the Clovis store ended up with "the best shrink numbers in the district."  With respect to Batze's witnesses, the court concluded that their estimates that he was working on non-exempt tasks 80 to 90 percent of the time were "exaggerated," and likely "the product of faulty memory," causing the court to discount their testimony.

The court also relied on the observational study that found Batze performed "a host of managerial functions" throughout the day, including "[d]irecting a clerk to make tags and signs[,] [¶] telling a stocker how to arrange merchandise[,] [¶] directing a stocker to re[-]merchandise a display[,] [¶] . . . [¶] speaking to the receiver about performance[,] [¶] talking to a receiver about an employee's time and attendance[,] [¶]. . . [¶] talking to a stocker about a soda shipment, talking on the phone with a frozen food manager about placing an order, talking with a store manager about an employee who was sick, and talking to a receiver and a manager about the placement of signs." While the study found that Batze spent more than 40 percent of his time working on displays and stocking, the court made clear that it did not agree that all time spent dealing with displays was non-exempt.  Although "'corporate'" controlled the designs, layouts and items to include on displays, Batze had discretion about what to display in some areas, and he could create themes and add tie-ins.  "Product placement can be important to marketing effectiveness.  Such an activity does not lose its exempt

status because of the company's desire for standardization and uniformity. . . . [¶] . . . Viewed from the vantage point of expensively-educated professionals, Mr. Batze's tasks may appear to be trivial, but they were not. These kinds of activities are important to a store like the Vons in Clovis. Someone needs to coordinate and oversee activities. Someone must make certain that displays are built, that the right merchandise gets on them, and that the merchandise is ordered in the right quantity and at the right time. That, coupled with the duty to look out for (supervise) fellow employees, constitutes the essence of management. The activities may not require great sophistication, but they require knowledge and the exercise of common sense."

The court found further support for its conclusions concerning Batze in the characteristics of the Clovis store: "[A]pproximately 115-125 people were employed at that location[,] . . . [its] average weekly sales reached $600,000[,] [it] occupie[d] 55,000 square feet, and the sales floor [took] up 40,000 square feet." A store of that size "cannot run itself, nor can one manager handle it. There are simply too many people and too many moving parts to the operation. [¶] . . . [W]hen employees are first hired to work in a supermarket, they generally have no training and probably no background in the food industry. They start in entry positions like courtesy clerks and advance to positions like front-end managers, grocery managers, and deli managers. . . . Someone has to give them instructions and make sure they follow them. The 'corporate people' are not there often

41

enough to do this task.  To fill the missing link, [respondent] uses managers and [AMs].  For this reason, among others, . . . it is hard to accept that the store's leadership could devote almost all their time to non-exempt physical work.  Even acknowledging the lesser customer interaction during night work, logic dictates that someone must direct and coordinate after-hours activities if the store is to remain organized and properly stocked.  The size of stores like Clovis, standing alone, constitutes strong evidence that . . . Batze had to have performed exempt tasks most of the time.  Otherwise, the night operation would have fallen apart."

The court concluded that the "reasonable, credible, and solid value evidence [respondent] presented with respect to [Batze's] time and tasks" satisfied its burden with respect to Batze:  "[Respondent] realistically expected him to manage, and he did so. . . . more than fifty percent of the time."

### 4.  *Cesar*

The court then turned to Cesar.  Preliminarily, the court pointed to Cesar's own testimony that he spent a minimum of one to two hours in the office, that he did not "typically sit or stand in one place during the day," that he did not "devote continuous time to one task, but d[id] many things in small increments," and that he was "constantly looking for opportunities to observe and communicate with employees."  The court also relied on Cesar's deposition testimony describing his activities on a typical day -- in

42

particular, the testimony that he spent no more than an hour checking that day and no more than one to two hours stocking shelves and building displays -- and his testimony in court that his tasks did not change much from store to store.  The court found it "difficult to accept the conclusions of [the co-workers who testified on behalf of Cesar] because 1) several g[a]ve time estimates that depart[ed] so far from logic that the court doubts their credibility; 2) some have been directly discredited; and 3) . . . their testimony depend[ed] on recollection, and where [respondent does] have records, those writings support [respondent's] position."[31]  The court also discounted the testimony of Cesar's witnesses because (1) many had "reasons . . . to be biased," either because they or their family members were pursuing suits of their own or had been the subject of criticism or discipline by respondent; (2) their work hours did not significantly overlap Cesar's; (3) their assessments of what constituted managerial work differed from the court's; or (4) they simply did not appear credible on the stand.  In short, the court concluded, documentary evidence "coupled with the testimony of [respondent's] witnesses, constitute[d] evidence that is more reasonable, credible, and of solid value than the memories of [Cesar's] supporters."

---

[31]    The documentary evidence to which the court referred were the records showing the minimal amount of time Cesar spent checking, the evaluations over the years of his managerial skills, and documents introduced by respondent showing Cesar gave written instructions to and disciplined subordinate employees.

The court specified the testimony it found particularly credible: (1) Kozak's testimony that the Blackhawk/Danville store had sufficient stockers and checkers that there was no need for AMs to perform those tasks, and that he had no difficulty meeting his store's operating ratio without relying on salaried AMs to perform non-exempt tasks; (2) Johnson's testimony that when she heard Cesar and another AM had spent a large amount of time in the check stand on her partial day off, she questioned why; (3) Gandolfo's testimony that as a First and Second AM, she spent the majority of her time engaged in managerial tasks, including observing, mentoring and disciplining employees, handling emails and daily time and attendance reports, scheduling, attending to recalls, regularly talking to department managers, and performing store walks; (4) Gandolfo's testimony that Cesar performed store walks similar to hers, spent more than half his time in the office, and did not spend excessive time stocking shelves or checking; (5) Carver's testimony that when she put Cesar on a PIP because his store was not meeting expectations, he did not suggest it was because he was required to perform non-exempt labor; (6) Obenour's testimony that she generally saw Cesar in the office doing paperwork at the Alamo store or walking the store to identify problems; (7) Navarrette's testimony that Cesar spent most of his time in the office at the Dublin store; (8) Simpson's testimony that she saw Cesar in the office two hours a day at the Blackhawk/Danville store and never saw him stocking shelves; and (8) Johnson's testimony

44

concerning the percentage of time Cesar spent at the front-end, in the back room, on the sales floor, in his office, and on managerial tasks.  Based on the evidence it found most credible, the court concluded that Cesar spent 35 percent of his time on store walks, 25 to 30 percent of his time in the office, and five to ten percent of his time on the floor engaged in other managerial tasks.[32]

### 5. *Hayes*

With respect to Hayes, the court recounted Lewis's testimony that when she "asked Hayes to run the store as though she were not there," he "made sales plans, drew up schedules, spent, she estimate[d,] 80% of his time in the office [citation], talked with employees, walked the front end[,] made observations, moved displays, and made a few changes to them."  Moreover, "[s]he did not observe Hayes stocking except for five or ten minutes when he replenished eggs or milk."  The court also recounted Lewis's "densely detailed narrative of management activities, based on her experience in that position":  "She described the [operating

---

[32]    Based on the check stand data, the court found nine weeks stood out from the rest because Cesar spent an unusually high amount of time checking -- 15 hours a week or more.  The court found that "it [was] probable that if [Cesar] had to devote exceptional time to this non-exempt task at the cash register, the situation at his store required him to perform other non-exempt tasks beyond what he normally performed," and therefore was primarily engaged in non-exempt activities.  For those weeks, the court awarded Cesar $11,090.25 in overtime pay.

ratio] system, participating in huddles, managing out[-]of[-]stocks, attending safety meetings, profit hour meetings, using front end activities as an opportunity to coach,[] and performing store walks. . . . She contradicted [appellants] (and especially Hayes) every step of the way, claiming that some 80-90% of her time is spent in the office managing [citation] and maybe 5-10% of her time at the front end, where she mostly manages. She said it was 'absolutely not' true that a manager had to check or stock to make [operating ratio]. She spends 'maybe thirty minutes to four hours a week' checking and next to no time building and stocking displays as she has clerks who do that." (Fn. omitted.) The court found Lewis "credible throughout."

The court also highlighted Cain's, Mastalski's, Patmore's, Feliciano's, and Chappelle's testimony that Hayes spent most of his time in the office, Mastalski's testimony that the Citrus Heights store manager preferred to let Hayes handle paperwork and administrative matters, and Feliciano's testimony that he never saw Hayes stocking. With respect to Chappelle's testimony that Hayes was responsible for scheduling the store's employees, the court observed: "He scheduled the night crew and the front end including courtesy clerks -- all told, over seventy employees. . . . This was not a simple task. One needs to know the sales projections, learn how many hours you have to work with, designate where people will work and at what times, what jobs need to be done, and who will do them. One needs to identify the best checkers and then schedule them into the

46

busiest periods.  As a result, it is not surprising that this witness [said] that Hayes spent 8-10 hours a week scheduling and writing those schedules in the manager's office."

The court discounted much of LePage's testimony. Because he was pursuing a claim against respondent, he had reason to be biased.  "[M]ore important, given his time away from the store, it is hard to accept that his conclusions about Hayes' time on tasks are accurate."

With respect to Hayes himself, the court pointed out numerous discrepancies between his testimony at trial and his deposition testimony, including whether he regularly reviewed and passed on information in departmental budget reports, whether he conversed with employees and department heads while performing store walks, and the amount of time he spent in the office at the West Sacramento store.  The court also found that Hayes had been less than honest concerning whether he reported to his workers' compensation doctor that his duties were managerial and not the same as a clerk's.  The court discussed the data provided by respondent summarizing the amount of time Hayes engaged in checking; it showed that he generally spent 15 hours or less per week in that activity, thus refuting his claim that he spent "the better part of his

days checking."[33]  It appeared to the court that Hayes's memory was faulty, and that he erroneously believed he was toiling more hours doing non-exempt work than he actually was.

Ultimately, the court concluded that Hayes spent "at least 55% of his time in the office performing exempt tasks," that "[a]t least 10-15% of his time was devoted to store walks, also exempt," that "he spent no more than 37% of his time in the check stand," and that "[t]he other non-exempt activities he performed did not consume more than 10% of his time."  In short, the court concluded, "[respondent] met its burden with respect to Justin Hayes."

### 6. *Realistic Expectations*

The court further found that respondent had a realistic expectation that its store managers and AMs would be involved primarily in exempt work.  The court focused on whether "there was enough exempt, i.e., managerial, work for [appellants] to fill their day."  If not, or "if there was plenty of managerial work but [respondent] constantly diverted [appellants] to non-exempt physical or clerical tasks, that constitute[d] evidence that [respondent] did not realistically expect [appellants] to manage."  The fact that respondent put most of its AMs, including Cesar and Hayes,

---

[33]  The court found two weeks in which the records showed Hayes spent 19 or 20 hours checking.  The court awarded Hayes $595.19 for those periods.

48

through the costly RLD program supported the inference that it reasonably expected them to spend the majority of their time managing: "[T]he program lasts six months during which future managers receive on the job training. They learn how to schedule, how to do payroll, in short, how to manage a store. They are tested on what they learn. The goal is for a participant to emerge equipped to run his or her own store. The training materials [citation] are extensive.[]" (Fn. omitted.) "[Respondent] spends over $50,000 per employee on this activity. It is difficult to see how [respondent] would invest this level of resources in such an undertaking, yet expect its graduates to spend more than 50% of their time performing non-exempt tasks like checking and throwing freight. The RLD program constitutes powerful evidence that [respondent] realistically expected its AMs to perform the exempt functions a manager would."

The court found further support for its determination that respondent's realistic expectation was that appellants would engage primarily in managerial work in the evidence concerning AMs' responsibilities. In addition to being responsible for the entire store on the store manager's day off, the First AM had nearly entire responsibility for the front-end, including customer service, checkout success, the outside areas, the lobby and the parking lot. The evidence further established that AMs were expected to schedule the employees' work hours and to discipline them. The court also relied on evidence that when AMs performed non-exempt tasks, the store suffered: "AMs are responsible for

service levels and conditions, and if they are tethered to a specific task, they are unable to move about and effectively manage the store." Carver testified that the Pleasant Hill and Lafayette stores suffered due to Cesar's failure to adequately manage. The evidence concerning the characteristics of the stores -- their size, the number of personnel each employed, and the number of daily sales transactions -- further persuaded the court that respondent realistically expected its managers to perform exempt tasks: "A store like this cannot run itself, nor can one manager handle it. There are simply too many people and too many moving parts to the operation."

The court found further support in the evaluations appellants received over the course of their employment. Batze's evaluations "focus[ed] on his management style, his ability to motivate others, mak[e] solid sound decisions, proactively involv[e] employees in decision making, not being afraid 'to go outside the envelope to make his department the best,' even calling his team on his days off." The court also discussed the evaluations for Cesar: (1) complimenting his hiring, training and mentoring abilities; (2) stating that he needed to learn to analyze financial reports and get involved in opportunities to save cost to "'add value to [the] bottom line'"; and (3) faulting him for failing to "make sure to follow through on work he . . . delegated." He was held accountable when one of his stores failed its safety audit. He was told his "'willingness to roll up [his] sleeves" got in the way of his managerial functions. He was criticized for

50

jumping into the check stand too often. Everything he was told to do to bring himself off the PIP was managerial in nature: "The company wanted Cesar to, inter alia, maintain store standards in merchandising, food safety and sanitation, and cleanliness; to plan with the department managers; to hold order writer meetings at least weekly; to do service mock shops once a day, five role-plays daily, and hold no fewer than three huddles a day; and to hold employees accountable to meet goals. The company wanted him to walk the store daily and create a store walk list of merchandising, food safety and sanitation and cleanliness, and to delegate to employees. He was to develop a system to ensure that all department managers knew, each day, information such as sales vs. projections." From evidence on "the macro level" ("[respondent's] policies and the syllabus of the [RLD] program") and "the micro level" ("disciplinary write-ups, . . . PIP forms, and performance evaluations") the court concluded respondent realistically expected appellants to manage.

### 7. *Exempt Work During Strike*

The court found that the work performed during the strike did not transform Batze or Hayes into non-exempt employees. The court found the strike constituted an emergency, during which neither employee lost his exempt status even if performing non-exempt work. In addition, the court found that Hayes's claim for work during the strike was barred by the statute of limitations, and that Batze's

51

claim to have worked long days at the Lake Isabella and Bakersfield stores was not credible in the face of other evidence -- including cash register data and Batze's own calendar -- showing him working his usual hours at the Clovis store.

8. *Statute of Limitations*

The court found that the statute of limitations precluded appellants from raising claims arising more than four years before the filing of their individual complaints and that the filing of the *Knoch* action in 2002 did not toll the running of the statute. Specifically, the court found "[t]he discrepancies between what happened to each of these many plaintiffs in each of their many stores are simply too great for the *Knoch* action to have put [respondent] on notice that it needed to preserve evidence with respect to every one of its managers and assistant managers." Moreover, respondent could not "'be expected to maintain all employment records relating to literally thousands of employees who have held multiple positions in hundreds of locations dating back to 1998 on the theory that such employees may decide after certification is denied to bring an individual suit." (Italics omitted.) The court found it "unrealistic to expect a business to gather statements from co-workers about co-workers and preserve them for so many years." The court further found that Cesar and Hayes had unreasonably delayed in bringing their actions after class certification in *Knoch* was denied. Finally, alluding to numerous instances during trial when

52

witnesses could not recall events, the court stated: "To force [respondent] to resist claims based on evidence up to twelve years old is not fair. Few, including [appellants], can accurately remember what happened that long ago, especially nonparty employees who were not focusing on the situation at hand."

Judgment was entered on the court's findings. This appeal followed.

## DISCUSSION

A. *Substantial evidence supports the court's determination that appellants were primarily engaged in exempt work.*

1. *Categorizing Work as Exempt or Non-exempt*

California's Labor Code mandates overtime pay for employees who work more than 40 hours in a given work week. (Labor Code, § 510, subd. (a).) However, the Legislature authorized the Industrial Welfare Commission (IWC) to establish exemptions for various categories of employees, including "executive . . . employees," where the employee is "primarily engaged in the duties that meet the test of the exemption," the employee "customarily and regularly exercises discretion and independent judgment in performing those duties," and the employee "earns a monthly salary equivalent to no less than two times the state

minimum wage for full-time employment."[34]  (Labor Code, § 515, subd. (a).)

In keeping with this authority, the IWC promulgated Wage Order No. 7-2001 (Wage Order), codified in the California Code of Regulations, which governs employees of the "mercantile industry" and sets forth criteria for determining whether an employee may be classified as an exempt executive:[35]  "(a) [His or her] duties and

---

[34]     As explained in *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004:  "Nearly a century ago, the Legislature responded to the problem of inadequate wages and poor working conditions by establishing the IWC and delegating to it the authority to investigate various industries and promulgate wage orders fixing for each industry minimum wages, maximum hours of work, and conditions of labor.  [Citations.]  Pursuant to its 'broad statutory authority' [citation], the IWC in 1916 began issuing industry-and occupation-wide wage orders specifying minimum requirements with respect to wages, hours, and working conditions [citation]. . . .  Consequently, wage and hour claims are today governed by two complementary and occasionally overlapping sources of authority:  the provisions of the Labor Code, enacted by the Legislature, and a series of 18 wage orders, adopted by the IWC."  (*Brinker, supra,* at p. 1026.)  Although the IWC was defunded in 2004, its wage orders remain in effect.  (*Gonzalez v. Downtown LA Motors, LP* (2013) 215 Cal.App.4th 36, 43; *California Correctional Peace Officers' Assn. v. State of California* (2010) 188 Cal.App.4th 646, 651.)

[35]     "'Mercantile [i]ndustry'" is defined as any business "operated for the purpose of purchasing, selling, or distributing goods or commodities at wholesale or retail; or for the purpose of renting goods or commodities."  (Cal. Code Regs., tit. 8, 11070, (*Fn. continued on next page.*)

54

responsibilities involve the management of the enterprise in which he/she is employed or of a customarily recognized department or subdivision thereof; and [¶] (b) [he or she] customarily and regularly directs the work of two or more employees therein; and [¶] (c) [he or she] has the authority to hire or fire other employees or [his or her] suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and [¶] (d) [he or she] customarily and regularly exercises discretion and independent judgment; and [¶] (e) [he or she] is primarily engaged in duties which meet the test of the exemption . . . ; (f) Such an employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment." (Cal. Code Regs., tit. 8, § 11070, subd. (1)(A)(1).)

The Wage Order states that exempt and non-exempt work "shall be construed in the same manner as such items are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order [2001]: 29 C.F.R. Section 541.102, 541.104-111, and 541.115-116." It also states that exempt work includes "all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out

---

subd. 2(H).) There is no dispute that respondent is in the mercantile industry.

exempt functions." (Cal. Code Regs., tit. 8, § 11070, subd. (1)(A)(1)(e).)

As this Court discussed in *Heyen, supra,* 216 Cal.App.4th 795, the 2001 version of section 541.102 of title 29 of the Code of Federal Regulations includes a list of activities "easily recognized" as exempt, including "'[i]nterviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property.'" (216 Cal.App.4th at p. 819, quoting 29 C.F.R. § 541.102(b) (2001).) Moreover, "exempt work includes not only the tasks necessary for the actual management of a department and the supervision of its employees, but also tasks that are 'closely associated with the performance of the duties involved in such managerial and supervisory functions or responsibilities.'" (216 Cal.App.4th at p. 819, quoting 29 C.F.R. § 541.108(a) (2001).)

56

The pertinent federal regulations discussed in *Heyen* contain examples of exempt and non-exempt activities directly applicable here: "'In a large retail establishment . . . , where the replenishing of stocks of merchandise on the sales floor is customarily assigned to a nonexempt employee, the performance of such work by the manager or buyer of the department is nonexempt.'" (*Heyen*, 216 Cal.App.4th at p. 820, quoting 29 C.F.R. § 541.108(c) (2001).) On the other hand, "'a department manager or buyer in a retail or service establishment who goes about the sales floor observing the work of sales personnel under his supervision to determine the effectiveness of their sales techniques, checking on the quality of customer service being given, or observing customer preferences and reactions to the lines, styles, types, colors, and quality of the merchandise offered, is performing work which is directly and closely related to his managerial and supervisory functions. His actual participation, except for supervisory training or demonstration purposes, in such activities as making sales to customers, replenishing stocks of merchandise on the sales floor, removing merchandise from fitting rooms and returning to stock or shelves, however, is not.'" (*Heyen*, *supra,* at pp. 820-821, quoting 29 C.F.R. § 541.108(e) (2001).)

The Wage Order defines "'[p]rimarily'" (Cal. Code Regs., tit. 8, § 11070(1), subd. (A)(1)(e)) to mean "more than one-half the employee's work time." (*Id.*, § 11070, subd.

(2)(K).)[36]  It also specifies the following method to determine whether the employee is "primarily engaged in duties which meet the test of the exemption":  "The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfied this requirement."  (Cal. Code Regs., tit. 8, § 11070, subd. (1)(A)(1)(e).)

In *Heyen, supra,* 216 Cal.App.4th 795, we resolved whether the checking, bagging and stocking activities of a grocery store manager could be considered exempt if the manager was "'also always still managing the store operations, including engaging in activities such as observing store operations and employee activities, and instructing employees in their assignments and any corrective measures that needed to be taken.'"  (*Id.* at p. 825.)  We concluded the employer's proposed "'multi-tasking' standard" was contrary to California law:  "[T]he federal regulations cited in Wage Order 7 expressly recognize that managers sometimes engage in tasks that do not involve the 'actual management of the department [or]

---

[36]     This is not a day-by-day analysis.  The issue is whether the employees "spend more than 51% of their time on managerial tasks in any given workweek."  (*Dunbar v. Albertson's Inc.* (2006) 141 Cal.App.4th 1422, 1426.)

the supervision of the employees therein.' [Citation.] In those circumstances, the regulations do not say, as Safeway would have us hold, that those tasks should be considered 'exempt' so long as the manager continues to supervise while performing them. Instead, the regulations look to the supervisor's reason or purpose for undertaking the task. If a task is performed because it is 'helpful in supervising the employees or contribute[s] to the smooth functioning of the department for which [the supervisors] are responsible' [citation], the work is exempt; if not, it is nonexempt." (216 Cal.App.4th at p. 826, quoting 29 C.F.R. § 541.108(a), (c) (2001).) Put simply, "the regulations do not recognize 'hybrid' activities -- i.e., activities that have both 'exempt' and 'nonexempt' aspects. Rather, the regulations require that each discrete task be separately classified as either 'exempt' or 'nonexempt.' [Citations.]" (216 Cal.App.4th at p. 822, italics omitted.)

We did not state, however, that the same task must always be labeled exempt or non-exempt: "[I]dentical tasks may be 'exempt' or 'nonexempt' based on the purpose they serve within the organization or department. Understanding the manager's purpose in engaging in such tasks, or a task's role in the work of the organization, is critical to the task's proper categorization. A task performed because it is 'helpful in supervising the employees or contribute[s] to the smooth functioning of the department' is exempt, even though the identical task performed for a different,

59

nonmanagerial reason would be nonexempt.'  [Citation.]"
(216 Cal.App.4th at pp. 822-823.)

In *Ramirez v. Yosemite Water, Inc. Co.* (1999) 20
Cal.4th 785, our Supreme Court considered whether an
employee fell into the exemption for an outside salesperson
(Wage Order No. 7-80).  In doing so, the Court clarified the
provision found in multiple Wage Orders, including Wage
Order No. 7-2001, requiring consideration of "the employer's
realistic expectations" and the "realistic requirements of the
job":  "Is the number of hours worked in sales-related
activities to be determined by the number of hours that the
employer, according to its job description or its estimate,
claims the employee *should* be working in sales, or should it
be determined by the actual average hours the employee
spent on sales activity?  The logic inherent in the IWC's
quantitative definition of outside salesperson dictates that
neither alternative would be wholly satisfactory.  On the one
hand, if hours worked on sales were determined through an
employer's job description, then the employer could make an
employee exempt from overtime laws solely by fashioning an
idealized job description that had little basis in reality.  On
the other hand, an employee who is supposed to be engaged
in sales activities during most of his working hours and falls
below the 50 percent mark due to his own substandard
performance should not thereby be able to evade a valid
exemption."  (20 Cal.4th at p. 802, italics omitted.)  The trial
court "must steer clear of these two pitfalls by inquiring into
the realistic requirements of the job," considering "first and

60

foremost, how the employee actually spends his or her time." (*Ibid.*, italics omitted.)  If the employee spends excessive time engaged in non-exempt activities, the trial court must then consider "whether the employee's practice diverges from the employer's realistic expectations, whether there was any concrete expression of employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job."  (*Ibid.*)

### 2.  *The Evidence Below*

Applying these principles, we conclude the trial court properly addressed the issues before it.  It found that appellants clearly met three of the five criteria of Wage Order No. 7-2001:  they supervised the entire stores or a sub-department; they customarily and regularly directed the work of two or more employees, they had authority to hire or fire other employees or to make suggestions and recommendations as to hiring, firing, promotions or other changes in employees' status, and they earned the requisite salary.[37]  With respect to whether they customarily and

---

[37]     We reject appellants' claim that there was no evidence their duties and responsibilities involved the management of the enterprise in which they were employed or a recognized department or subdivision of the enterprise (Cal. Code Regs., tit. 8, § 11070, subd. (1)(A)(1)(a), or that they customarily and regularly directed the work of two or more other employees (*id.*, § 11070, subd. (1)(A)(1)(b)).  The evidence established that Batze (*Fn. continued on next page.*)

61

regularly exercised discretion and independent judgment and were primarily engaged in exempt duties, the court waded through weeks of testimony from dozens of witnesses and a massive quantity of documentary evidence in concluding that respondent had met its burden of proving they did. The evidence supporting the court's findings was carefully documented in its MSOD and outlined above. With respect to Batze, the testimony of his store manager, Michelle Macaluso, and the observational study provided substantial evidence that while working as a Second AM at the Clovis store (the only assignment under consideration due to the court's statute of limitations ruling) Batze spent the majority of his time on managerial tasks.[38]

---

was in charge of the entire store and the 10-member night crew during his shifts. As First AMs, Cesar and Hayes were responsible for the front-end and its employees. In addition, both had been responsible for entire stores during the store managers' days off, vacations and leave, and had been acting store managers in some of their assignments.

[38]     Appellants claim the observational study was faulty because it took place on a Monday, the day on which Macaluso held the weekly department manager's meeting (which occupied 37 minutes and 40 seconds of his time) and because it included a period of training on time and attendance corrections (18 minutes and 20 seconds) which they contend should have been deemed non-exempt. We believe the more germane statistic is the one showing that Batze spent only approximately 40 percent of his time building displays and stocking, activities which he claimed occupied nearly all his work time. According to Macaluso, Mondays were one of the three days of the week displays were
(*Fn. continued on next page.*)

62

Cesar's situation was more complex, as he had multiple assignments at multiple stores during the relevant claim period. But the evidence presented covered some aspect of each of his assignments. Janet Naverrette, who worked with him at the Dublin store, testified Cesar was in his office 50 percent of the time dealing with managerial problems. She also saw him perform store walks up to two hours long, a task the court reasonably found exempt because of its importance to proper management of the stores. Beverly Gandolfo, who had been a stocker at the Livermore store during Cesar's time there, did not recall his assisting her with that function with any regularity and testified there were sufficient hourly stockers to complete the task without the assistance of the AMs. There were no defense witnesses who worked alongside Cesar at Pleasanton, Pleasant Hill, Lafayette or Orinda, but respondent provided records showing that Cesar spent minimal time checking during that period. Cesar himself testified that he spent significant periods working at the front-end during his assignments to those stores, including nearly 100 percent of his time at the Pleasanton store. The court reasonably found that working at the front-end, except while actually checking, was a managerial assignment because it required the AM to

---

built. From the fact that building displays occupied less than half of Batze's time on a typical Monday, the court could reasonably conclude these tasks occupied significantly less time than Batze and the witnesses who supported him perceived.

observe and direct the checkers to ensure they were properly performing their jobs and providing superior customer service. Moreover, Cesar was acting manager of the entire store when he was at Pleasant Hill. Helen Carver testified concerning Cesar's performance at Pleasant Hill and Lafayette, and explained that she transferred Cesar from Pleasant Hill to Lafayette and placed him on a PIP after Orinda because he was not meeting respondent's managerial expectations. Numerous witnesses testified concerning Cesar's performance at the Blackhawk/Danville store, including two managers: Steven Kozak and Kimberly Johnson. Both testified that Cesar spent his time primarily on managerial tasks. Finally, at his deposition, Cesar himself attested to his "typical" day at Alamo, supporting the determination that he spent only two to three hours on non-exempt tasks.[39] This was confirmed by Susan Obenour, who estimated that Cesar worked in the office 30 to 55 percent of his time at that store.

Hayes worked at multiple stores as well, and evidence was presented that supported the court's findings as to each of them. Joseph Chappelle, the store manager when Hayes was at the Arden Way store, and Camelia Chira, a co-worker there, both testified that Hayes spent the majority of his time -- up to 70 percent -- in the office. Lisa Lewis relieved

---

[39] Appellants contend Cesar's deposition testimony indicated he spent additional time on non-exempt tasks, but cite only to the lodged deposition transcript, not to the trial record.

Hayes as manager of the West Sacramento store and had him walk her through his duties as manager for two weeks. She testified he spent the majority of his time in the office on managerial tasks. Lewis had come from the Elk Grove/Laguna store to which Hayes was transferred and described her duties, which were primarily managerial. Several employees who observed Hayes at the Citrus Heights store -- district manager John Cain and co-workers Lance Feliciano and Melissa Mastalski -- testified he was primarily involved in managerial tasks.[40]

Appellants do not dispute any of this evidence, but contend it was insufficient because it did not cover in week-by-week detail all periods in which they worked. Appellants point out that in challenging class certification, respondent argued that "'managers were not trained uniformly,'" "'[m]anagers [did] different jobs at different times,'" "'[e]ven

---

[40] Appellants contend the court improperly inferred from the evidence that they engaged in specific non-exempt tasks for limited periods of time that they were engaged in exempt tasks the remainder of their time. We disagree. There were only a few non-exempt activities that appellants claimed occupied a significant portion of their workday: building/filling displays, stocking/facing shelves, and checking. The evidence presented by respondent refuting that appellant spent excessive time on these tasks supported the conclusion that appellants spent more time on the managerial portion of their jobs. Moreover, as the above discussion establishes, the court did not rely exclusively on this inference to establish the ratio between exempt and non-exempt activities.

stores of similar size operate differently,'" and there were "'many differences among [its] stores which affect the time spent on various job duties.'" The trial court adopted respondent's arguments, at least in part, in concluding that "'significant differences in the size of [the] various stores, both in dollar volume and physical configuration, to the seasonal nature of business at certain stores, to the differences in daily tasks allegedly flowing from variations in the managerial skills and experience of any given team of managers in a given store, both as to location and as to time,'" militated against class certification, as did the testimony showing that a number of managers "'perform[ed] different duties and/or allocated the time differently among similar tasks depending on the store to which they were assigned.'" Appellants claim respondent is now taking a contrary position, "arguing that a single day at a single store could be used as a basis for inference and extrapolation, even without evidence of any of the myriad factors it previously claimed made such assumed facts impossible."

Our review of the record finds no such contradictory positions taken by respondent or adopted by the trial court. The evidence presented established that each appellant had varying duties. Batze was in charge, inter alia, of displays, which required him not only to build and fill them, a non-exempt task, but to deal with vendors and consider how displays could be used to the best advantage of his store. Neither Cesar nor Hayes spent a significant portion of his time building displays. Nor did either spend as much time

66

in the back room as Batze, who had his office there in order to deal more efficiently with vendors and fulfill his responsibility of keeping the area organized. Both Cesar and Hayes spent more time managing the front-end of the store and ensuring checkers and courtesy clerks performed efficiently, while providing superior service to the customers. This required them to step in and out of the check stands, a non-exempt task Batze rarely performed as the bulk of his workday occurred before the store opened for customers. Batze spent little time scheduling, as his crew was fairly small, whereas Hayes spent a significant number of hours per week on this task at one of his stores, scheduling more than 70 employees. Both Hayes and Cesar had responsibility for their stores on the store manager's days off or when the manager was on vacation or leave. Moreover, both had been acting store managers at various times, something Batze never experienced, and had significantly more responsibility for discipline than Batze. In reaching its conclusion, the court took all this evidence into account, including evidence of the variations in tasks from party to party and store to store.

Appellants claim there were substantial gaps in the evidence that precluded a finding in respondent's favor for every contested period of their employment. For example, appellants contend there was no defense evidence covering Batze for the period prior to 2004, when Macaluso became the store manager and the observational study was conducted. They further point to the lack of defense

67

witnesses who directly observed Cesar for the periods he was assigned to Pleasanton, Pleasant Hill, Lafayette and Orinda, or for Hayes for part of the period he was assigned to the Arden Way store.[41] As discussed, there was sufficient defense evidence from which the court could make reasonable inferences about how appellants spent their time at every store. Although the significant period for determining exempt status is the work week, and "'employees' exempt or non-exempt status can vary on a week by week basis'" (*Dunbar v. Albertson's Inc.*, *supra*, 141 Cal.App.4th at p. 1426), this rule in no way suggests that the trier of fact may not make reasonable inferences about a party's activities during the relevant period based on his or her activities in earlier and later periods, particularly where there is nothing to suggest the employee's duties and responsibilities changed significantly. (See *Leatherbury v. C&H Sugar Co.* (N.D. Cal. 2012) 911 F.Supp.2d 872, 883-884 [employee's "description of his typical day" showed that "his primary duties were either the direct supervision of the union employees or other activities that were 'directly and closely related to exempt work' or were 'a means for carrying

---

[41] Appellants primarily fault respondent for failing to present witnesses for periods the court found to be outside the statute of limitations, for example, Batze's time at the Blackstone store from 1998 to 2000, Cesar's time at the Walnut Creek/Bancroft store in 2001 and 2002, and Hayes's time as a Second AM. Because we find no error in the trial court's statute of limitations determination, we do not consider these periods.

out exempt functions or [were] closely related to the supervision of the union employees'"]; *Maddock v. KB Homes, Inc.* (C.D. Cal. 2007) 248 F.R.D. 229, 242 [when classifying employees as exempt or non-exempt, California law "calls first for an individualized inquiry into the work actually performed in a typical workweek by the employee to determine how much of that work is exempt"].) Here, neither Batze nor Hayes testified that his responsibilities varied markedly from store to store or week to week, and Cesar affirmatively testified that his responsibilities did not. In short, the evidence amply supported the court's conclusion that in all their assignments, appellants' work was primarily managerial and thus exempt.

Similarly supported was the court's finding that to the extent appellants spent excessive amounts of time performing tasks that could have been performed by hourly workers, respondent realistically expected them to be engaged primarily in managerial activities. (See *Ramirez, supra,* 20 Cal.4th at p. 802 ["[A]n employee who is supposed to be engaged in [exempt] activities during most of his working hours and falls below the 50 percent mark due to his own substandard performance should not thereby be able to evade a valid exemption"].) The court cited the extensive and costly management training respondent provided most new managers, the contents of the RLD program, the numerous managerial responsibilities assigned to the AMs, the size and complexity of the stores, the testimony of multiple managerial employees that they had no trouble

meeting the operating ratio, providing good customer service, keeping the check lines moving, the shelves stocked and the stores clean and organized without doing the work themselves or relying excessively on salaried employees, the evidence that stores suffered when managerial employees spent too much time on non-exempt tasks, and the evidence that Cesar in particular had been criticized for performing hourly work rather than attending to managerial duties. The court's finding as to respondent's realistic expectations, amply justified by the evidence, further supports the determination that appellants were exempt employees.

Appellants claim the trial court improperly placed on them the burden of proving that they performed non-exempt work. They point to its citation to the 1993 DLSE letter suggesting a presumption arises that an employee's duties are exempt if he or she "'fulfills all of the other requirements of the managerial or executive exemption . . . .'" (Underscoring omitted.) They further contend the court's references to respondent's "'[r]ealistic [e]xpectations'" indicate it used respondent's expectations to create a presumption that the majority of tasks performed were exempt. The lengthy MSOD leaves no doubt that the court understood and applied the appropriate burden of proof. Indeed, it reiterated that burden throughout its decision.[42]

---

[42]     On the second page of the MSOD, the court stated that "with the exception of a few discrete . . . workweeks -- Safeway has met its burden of proof with respect to these plaintiffs." On the following page, it noted: "Both sides agree that the *(Fn. continued on next page.)*

70

In addition to clearly and repeatedly articulating the correct burden of proof, the court carefully outlined the evidence on which it relied in finding that appellants performed exempt tasks the majority of the time. In short, appellants' claim that the court erroneously shifted the burden of proof is belied by the record.

Appellants claim the court improperly categorized the three work activities frequently engaged in by AMs: managing out-of-stocks, store walks, and working at the front-end.[43] They contend that scanning the bar codes for

_____

defendants have the burden of proof with respect to their affirmative defense to the effect that the plaintiffs meet the requirements for the executive exemption . . . ." As to the individual appellants, the court found: (1) "that [respondent] has met its burden with respect to Gary Batze"; (2) that "[t]he evidence preponderates that for the majority of the weeks in question, Carlo Cesar spent more than fifty percent of his time engaged in exempt activities," but that as to certain weeks, "[respondent] has not met its burden of proof"; and (3) that with the exception of two pay periods, "[respondent] . . . has met its burden with respect to Justin Hayes." On the 99th page of the 101-page decision, the court states: "Here most of the evidence preponderates in favor of the defendants, with the conclusion that they have met their burden of proof."

[43] Appellants contend that in this regard, the trial court disregarded *Heyen*. The same trial judge presided over the trial in *Heyen*, where we affirmed his ruling that an employee cannot be seen as simultaneously performing exempt and non-exempt tasks, i.e., "'actively . . . manag[ing] the store while also concurrently performing some checking and bagging of customer grocery purchases.'" (*Heyen, supra,* 216 Cal.App.4th at p. 799.) (*Fn. continued on next page.*)

71

out-of-stock products should have been deemed a non-exempt activity because it is routinely done by hourly employees.  The court recognized that this task could be done by hourly employees.  When performed occasionally by an AM, however, the court concluded that walking the aisles scanning out-of-stocks was exempt because it assisted the AM to fulfill his or her managerial responsibility for determining when and where out-of-stocks occur and minimizing them.  The regulations permit the trier of fact to make such distinctions.  (See Cal. Code Regs., tit. 8, § 11070, subd. (1)(A)(1)(e) ["Exempt work shall include . . . all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions."]; *Heyen, supra*, 216 Cal.App.4th at p. 822 ["[I]dentical tasks may be 'exempt' or 'nonexempt' based on the purpose they serve within the organization or department.  Understanding the manager's purpose in engaging in such tasks, or a task's role in the work of the organization, is critical to the task's proper categorization.  A task performed because it is 'helpful in supervising the employees or contribute[s] to the smooth functioning of the department' is exempt, even though the identical task

_____

Nothing in the MSOD suggests the trial court included time spent on non-exempt tasks when calculating whether managerial tasks occupied more than 50 percent of each appellant's workday, or that the court believed an employee could be engaged in both exempt and managerial activities simultaneously.

performed for a different, nonmanagerial reason would be nonexempt"].)

Appellants claim that store walks should have been deemed non-exempt because they might involve cleaning, fixing displays, stocking shelves or returning products to the correct shelves. The court found that the "long" store walks, the walks lasting "from two to two and a half hours," were "the chief method a manager uses to determine what is going on in the store and where (and with whom) he needs to devote attention," that the walks "offer an opportunity to interact with employees, survey the merchandise and spot needs, especially with respect to the all important out-of-stocks," and that "[a] momentary pause" during a lengthy walk conducted for these purposes did not "turn the activity from exempt to non-exempt." That managerial employees performed lengthy store walks once or twice a day for the purpose of talking to department heads and other employees, assessing the condition of the store and determining the problems that needed to be addressed throughout the store that day, was established by the testimony of numerous witnesses, and supported the court's categorization of store walks as exempt tasks.

Appellants similarly claim that time spent at the front-end was non-exempt, contending it was "uncontroverted" that much of their front-end time was spent checking, bagging and performing other routine services for customers. To the contrary, the evidence established that AMs were put at the front to improve customer service by observing the

checkers and courtesy clerks to determine whether they were working efficiently and providing satisfactory customer service. AMs were told to stand in one place to observe and manage, not to check. Moreover, as appellants acknowledge, if circumstances required an AM to step in to check, that time was recorded on the checking data submitted by respondent. The trial court reviewed that data carefully and concluded that with minimal exceptions, appellants were not required to spend excessive time checking.

B. *The court properly rejected Hayes's and Batze's claims for work performed during the strike.*

Section 541.706 of title 29 of the Code of Federal Regulations (formerly 29 C.F.R. § 541.109) (2004) provides that "[a]n exempt employee will not lose the exemption by performing work of a normally nonexempt nature because of the existence of an emergency." A employee strike, even a lengthy one, can constitute an emergency. (See *Dunlop v. Western Union* (D.N.J. Jan. 28, 1976) 1976 U.S. Dist. LEXIS 16956, *4 [facts must be analyzed in evaluating whether a lengthy strike constitutes an emergency; court cannot simply presume it loses its emergency status after set amount of time].)

The court ruled that the strike constituted an emergency under the regulations. It further ruled that the period Hayes spent replacing striking employees was beyond the statute of limitations for his complaint, filed in October 2008. With respect to Batze, the court found not credible his

74

testimony that he worked lengthy hours replacing striking workers in Lake Isabella and Bakersfield.  Batze was impeached by his own calendar and by checking data showing him working in Clovis during the strike.  In addition, Macaluso denied that Batze had been sent to other stores to work after she arrived in January 2004.  The court's finding was supported by substantial evidence, and its decision to credit respondent's evidence over Batze's testimony "with respect to how Batze spent his time and how long he worked" was within its purview as the trier of fact.

C.  *The trial court did not err in finding the statute of limitations was not tolled.*

Appellants contend that under the rule of *American Pipe & Construction Co. v. Utah* (1974) 414 U.S. 538 (*American Pipe*), the statute of limitations was tolled from the date the *Knoch* action was filed in 2002 until the trial court's order denying class certification was filed in September 2008, and that their work assignments dating back to 1998 should have been at issue.  We conclude the court properly analyzed the tolling issue under the relevant authorities.

In *American Pipe*, the United States Supreme Court held that under certain limited circumstances, the filing of a class action lawsuit could toll the statute of limitations with respect to individual members of the putative class who made timely motions to intervene after the court denied certification.  (*American Pipe, supra,* 414 U.S. at pp. 552-

553.)  In *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103 (*Jolly*), the California Supreme Court considered whether and when to apply that rule in line with its view that "in the absence of controlling state authority, California courts should utilize the procedures of rule 23 of the Federal Rules of Civil Procedure," and concluded:  "The presumption . . . should be . . . that lack of commonality will defeat certification and preclude application of the *American Pipe* tolling doctrine."  (44 Cal.3d at pp. 1118, 1125.)  Thus, "putative class members would be ill advised to rely on the mere filing of a class action complaint to toll their individual statute of limitations."  (*Id.* at p. 1125.)  A trial court may, nonetheless, apply tolling to save untimely claims.  But in doing so, the court must address "two major policy considerations."  The first is "protection of the class action device," which requires the court to determine whether the denial of class certification was "unforeseeable by class members," or whether potential members, in anticipation of a negative ruling, had already filed "'protective motions to intervene or to join in the event that a class was later found unsuitable,' depriving class actions 'of the efficiency and economy of litigation which is a principal purpose of the procedure.'"  (*Jolly, supra,* at 1121, quoting *American Pipe, supra,* at p. 553.)  The second consideration is "effectuation of the purposes of the statute of limitations," and requires the court to determine whether commencement of the class suit "'notifie[d] the defendants not only of the substantive claims being brought against them, but also of the number

76

and generic identities of the potential plaintiffs who may participate in the judgment.' [Citation.] In these circumstances, . . . the purposes of the statute of limitations would not be violated by a decision to toll." (*Jolly*, *supra*, at p. 1121, quoting *American Pipe*, *supra*, at pp. 554-555.)[44]

Here, class certification was denied due to lack of commonality, giving rise to a presumption that *American Pipe* tolling should not apply. The trial court, nonetheless, considered whether to do so under the standards set forth in *Jolly*. It found the discrepancies between the claims of the members of the putative class were "too great for the *Knoch* action to have put [respondent] on notice that it needed to preserve evidence with respect to every one of its managers and assistant managers," that respondent had no way of predicting which of the thousands of managerial employees

---

[44] The California Supreme Court applied these rules to conclude that the statute was not tolled in the case before it -- a mass tort action for personal injury. "Because of the nature of the [original] complaint . . . and the differences in issues of fact and law . . . the [original] class suit [citation] could not have apprised defendant of plaintiff's substantive claims" nor "put defendants on notice of allegations related to personal injury within the statutory period of limitation so that they might prepare their defense." (*Jolly*, *supra*, 44 Cal.3d at pp. 1123-1224.) Although the Supreme Court did not specify a standard of review, the principles under which the tolling determination are to be made are equitable, and we generally review a trial court's decision to grant or deny equitable relief for abuse of discretion. (*County of San Diego v. Gorham* (2010) 186 Cal.App.4th 1215, 1230.)

holding multiple positions in hundreds of locations would believe themselves to have been deprived of overtime and decide to bring a suit, and that it would have been unrealistic to expect that the filing of the *Knoch* action would have prompted respondent to maintain all employment records relating to every managerial employee or to gather evidence and witness statements pertaining to every managerial employee.

The evidence presented bore out the court's conclusions.  Each appellant relied on different facts and different scenarios, and there was little overlap in the evidence to support the respective claims.  Moreover, numerous managers and AMs testified that the majority of their workdays was spent attending to managerial duties.  Respondent could not have anticipated who might be a member of the putative class when the *Knoch* action was filed in 2002, and thus had no realistic opportunity to prepare a defense for the potential claimants.  The fact that nearly 200 plaintiffs had already brought individual claims before the class certification was denied adds further support to the trial court's ruling, as it demonstrates that denial of class certification was not unforeseen.  The court also found that Cesar and Hayes unreasonably delayed asserting their claims after certification was denied, adding to the prejudice to respondent of defending stale claims.  Under these circumstances we discern no error in the trial court's determination that the statute of limitations was not tolled.

**DISPOSITION**

The judgment is affirmed.  Respondent is awarded costs on appeal.

**CERTIFIED FOR PUBLICATION**



MANELLA, J.

We concur:



EPSTEIN, P. J.



WILLHITE, J.

79